Clause number 24-10900, X Corporation v. Media Matters for America. Is the appellant ready to proceed? You may. May it please the Court. The District Court's discovery order strikes at the heart of the First Amendment right of association. It compels Media Matters to turn over the name of every single donor, the address of those donors, and how much money each donor gave. X's demand for this highly sensitive personal information that has no plausible relevance to the issues in this case comes nowhere close to surviving the exacting scrutiny that the Supreme Court recently emphasized applies to efforts to overcome the First Amendment right to anonymity. That is why X is unable to cite a single order from any court ever requiring the disclosure of this sensitive donor information. And the First Amendment right to association is at its zenith in a case like this one because as the state panel recognized, the risk of chill is not merely theoretical. X's owner said, and I quote, I want to be clear that anyone funding that organization, we will pursue them. Desperate to avoid merits review of this discovery order that has such an astonishing and unprecedented scope, X is forced to advance procedural arguments that defied decades of precedent and would have adverse consequences for constitutional litigation more generally. First, X argues there's no appellate jurisdiction. Even though this court has recognized time and again that pretrial orders infringing on First Amendment rights are subject to collateral order review because the First Amendment injury cannot be vindicated post-trial after the harm has already occurred. Not once has this court rejected the collateral order doctrine for claims that a First Amendment right is being violated through the pretrial process. That should end the jurisdictional issue. Second, X argues that a court order compelling disclosures is not state action. Even though landmark constitutional cases and this court's reversal of a discovery a few years back in whole women's health because of free exercise concerns rest on exactly that principle. That a court order under compulsion and legal coercion amounts to state action. Third, X argues it is easier for an everyday citizen to waive constitutional rights in civil cases than it is for criminal defendants to waive their rights. Yet the standard for waiver of constitutional rights that there must be an intentional relinquishment of the right originated in a civil case. That case is Johnson v. Zerps. It's a 1930 Supreme Court case. If counsel, isn't the waiver in this case more of a sanction for media matters failure to comply with an order to produce a privilege log? Isn't it more of a sanction than it is some kind of waiver? Well, two responses, Your Honor. First of all, the standard is intentional relinquishment when you're talking about our First Amendment rights. The entire waiver analysis by the district court was infected by the failure to recognize that there needs to be affirmative conduct waiving this First Amendment right that was the focus of this entire discovery dispute that for months we were trying to get before the district court. But second, so I think the standard itself warrants reversal. But on the standard, it seems to me that the intentional relinquishment standard that you mentioned, the cases where I see that standard applied are where a party just fails to raise an issue. But here, waiver is not based on a party's failure to raise an issue. It's based on a party's failure to comply with a court order. And isn't that different? Well, first of all, we did, as I'm going to discuss, we raised the issue at the beginning of the discovery process and throughout the discovery process I'm about to walk through. Once we've raised the privilege, to find that we later somehow waived that right we've asserted would require an intentional relinquishment because, you know, this standard applies in civil cases. I'll cite to Florida prepaid. It's a Supreme Court decision involving sovereign immunity. So like a First Amendment privilege, you have to first invoke sovereign immunity. And yet the Supreme Court said there, to find that you've intentionally waived sovereign immunity, it requires that finding of intentional relinquishment. Mere forfeiture, mere mistake, mere inadvertence is not enough. But let me go right to the point that there was no waiver, there was no failure to comply with the court order, even under the most deferential standards. We followed the court's deadlines to the letter. On June 6th, the court denied X's attempt to overrule our objections. We, you know, we ruled 26 objections, relevance, harassment, overly burdensome, standard objections. X said overrule those. The court said no, it's premature, and then set a deadline that included a June 14th deadline for production of a privilege law. That's ROA 978. Well, just a few days later, the parties discuss the general discovery deadlines and decide it doesn't allow enough time. So just four days later, on June 10th, the parties filed a joint motion to amend. It says, first of all, more time is needed to comply with the court's order, that it set the June 14th deadline, among other things. And then it expressly says, the parties jointly propose to add additional time for review of documents for potential privilege and production of laws. That's ROA 983, filed on June 10th, four days before the deadline. Then on June 13th, the court grants the joint motion and issues a new scheduling order, and this is an ROA 1009. This is what that scheduling order says. Among other things, it sets the deadline for the defendant to provide its first privilege law on June 28th, and then we did exactly that, ROA 2037. We produced our first law on June 28th. The importance there is first. First means first. It has two consequences. One, we didn't need to produce a privilege law before the first one was due, on June 28th. And second, the fact that it says the first law necessarily means there's going to be subsequent ones. So it doesn't need to be a one-time, all-comprehensive privilege law. There was going to be a series of laws. What did your client intend to include in this privilege law, since the objection was pending? Well, that's a good point, Your Honor, because there still were the Rule 26 objections, and I think that's part of the misunderstanding that happened in the district court, because your search for documents is always going to be limited by your objections to the scope of the request, until and unless the court were to overrule those, and as I just mentioned, the court hadn't done so. So we still had pending relevancy objections, harassment, other Rule 26 objections, but we still searched for words like ex, musk, content moderation, because those, our objections weren't objecting to the entirety of all this discovery that was requested. We narrowed the terms based on our objections. We searched for terms, again, like ex and musk, and then of the documents gathered by that search, we did look then for privilege. But you admitted, your searching for documents that were directly responsive to all of ex's requests. So whatever lack of clarity there may have been on the timing of when you had to log the privileged documents, there was no doubt that you were required to search for responsive documents to all the requests, isn't there? Your Honor, we had a search for documents limited by our objections that had not been overruled. That's standard discovery practice. You know, there's two separate aspects of discovery. You object under Rule 26 . . . forget First Amendment for a second. Let's say this was just a run-of-the-mill attorney-client privilege case. You object to the discovery if you think it's overly broad, irrelevant. Again, those objections can be challenged, but when they're still pending, like they were here, you search for documents that are responsive, limited by your objections. Then let's say you get a thousand documents. You would then go through those thousand documents for privilege review. That's exactly what we did here, and on June 28th, we did produce some document, or have a privilege log, that included a First Amendment assertion. The key to the term you referenced is separately, right? We didn't separately search for donor names because we had objected to that, right? So there was no . . . it wasn't within our scope of our search unless it came up with these words like ex, musk, and content moderation that we did search for, and the search for those documents did produce some privilege documents that we put on our log that we submitted timely on June 28th. I don't want to talk about the third point that Judge O'Connor thought amounted to a waiver. He says that our amended responses omitted the First Amendment defense, privilege. That's not true under any reading of those responses. What had happened was we initially just cited the First Amendment privilege, and then ex says, well, there's a lot of First Amendment rights. There's speech, there's free exercise, there's press, there's associations. Please be more specific. So we amended our responses and did a whole host of amendments, but on the privilege issue, we specified the exact right. The language is, disclosure of donor identifying information can lead to donors being harassed and deterred from affiliating with organizations they support. We were directly specifying it's the right of association, and to remove any doubt, that assertion of the associational right is followed for all four discovery requests by a footnote that cites American for Prosperity Foundation, the Supreme Court decision a few years ago that's the most significant associational right decision of the last half-century, and there's an extensive footnote that quotes from that case about the importance of the associational right. And then third, in those amended responses, we asserted that we would be producing privilege logs on a document-by-document basis as is standard, because again, they had said you can't just do this on a blanket basis. We turn to Rule 26. You argued that the district court failed to address your Rule 26 concerns or objections, but it did discuss relevance, it did discuss proportionality in the context of the balancing analysis under the First Amendment, and I just wonder if if that analysis under the First Amendment encompasses the Rule 26 analysis, or does it have to be explicitly separately conducted? Well, the motions panel concluded that it had to be done independently, and I think in no reading of the district court's order shows that there was an independent assessment. I would point to one of our objections under Rule 26, which is harassment, which again I think is especially strong here given the threats by X's owner directly, not just to our organization calling it evil, but to our donors saying that he is coming after them. And so harassment was not addressed by the court, and I also just think the entire Rule 26 balancing . . . And you wouldn't think the harassment analysis under Rule 26 was encompassed necessarily by the First Amendment analysis? No, it was not expressly. I mean, I do agree, Judge Willett, there is some overlap, but even if let's say the court, despite, you know, our clear following to the letter of the court's deadlines, thought there was a waiver of the First Amendment, the Rule 26 issues are still live, and in no way, as the motions panel explained, is this donor information relevant? You know, how is the name of a person who gave a $50 donation to Media Matters three years ago relevant to this lawsuit over two discrete articles that were published in November of 2023? How is that person's address relevant? How is it relevant that this person gave $50 instead of a $50? How does the court, if we remand . . . Well, the efficient course, Your Honor, we all came to New Orleans, there's extensive briefing, it is an interlocutory appeal, right? Much of the litigation is already on hold, waiting for these decisions. So it would be the most efficient course to resolve those issues, again, because I . . . especially if they're not a close call. There is no relevance, no, to overcome the harassment and the other Rule 26 objections to this information about donor identity, donor addresses. Didn't they back off of it, questioning the address, that, oh, we want the county or the parish or whatever? There's a footnote in their brief that, again, it has caveats. It says we can't commit to never seeking that information. So it's still a live issue that they hedged in the brief. We're also facing an order that, unless this court reverses, it would compel us to produce that information, because the order says produce every single thing responsive to these four discovery requests. And nothing in the district court's order, it talks generally about relevance, but much of this could be done through interrogatories, right? They could ask, how many donors did you have? How much money did you raise in Texas, nationwide, without infringing on this associational right? So there was no waiver under an intentional relinquishment standard that the district court didn't even recognize to apply. There's no waiver even under a deferential standard, but I would note the appellate standard of review is an independent examination of the record, not the usual deference to discovery orders, because this is a First Amendment case. So we would ask the panel to reverse the district court's order .                  That would go a long way to being able to show to a jury a reason for why Media Matters lied. It would be powerful evidence that we would need to show malice. Now until we actually know who the donors are, it's hard to be more granular than that. That at least satisfies Rule 26's very forgiving relevance standard, which just requires that the materials tend to prove some fact in dispute. I think the question you asked earlier, Judge Clement, was what Media Matters intended to produce. The answer is in Record 1650 where they said they were not going to produce any, independently searched for, any of the materials responsive to 17, 18, 21, or 35. Now my friend on the other side suggested, for example, we could have propounded a more limited interrogatory. We did. We had interrogatory two that asked for just their top 20 donors, hoping to have a much more, a sort of more target example as my friend suggested we did. We were greeted with the same response. They're not going to provide any of that information on First Amendment grounds and we can, to put too fine a point on it, kick rocks. They relied on the same objections. The same, essentially the same objection. It's a different posture in the case, but the same First Amendment objection. Yes, Your Honor. So for purposes of discussing this Rule 37 obstinacy, this is not a case of some sort of mere misunderstanding. My friend on the other side quotes, for example, that there were other discovery order, the other discovery order extensions made. Well, on page, I believe it's 983 of the district court's order, the joint stipulation rather, seeking station of discovery deadlines, says that the parties, and I'm quoting here, have proposed a modest modification of the deadlines contained in the court's recent order and then it cites to the June 6th order. A modest modification, which is what we came to, a two week modification extending the time for that law, that ordered law under June 6th for 14 more days. We agreed to that. Come July 29th, in records 1645 and 1646, X contacts Media Matters and says, we believe you're in violation of the June 6th order. You are under obligation to search for and log any privileged documents. We get in response, we're not going to independently search. Let me tell you how independently search works. Well, Counselor, and I think we're still on the subject of waiver. We are, yes, Your Honor. And so, isn't one of the reasons that the district court gave for the waiver is a finding that Media Matters produced a no privilege log at all? Did the district court make that finding? The district court made that finding and based on the ... Is that a correct finding? It's a little over broad, Your Honor, but it's not incorrect for purposes of this, because the first ... It's not just flat wrong? It's wrong in a way that I think doesn't change this court's analysis and I'll explain why. The first time that Media Matters cited anything on a privilege log claiming a First Amendment privilege was September 6th. That's to say, a week after we saw the second motion compel and three full months after the district court had issued its June order. So the idea that Media Matters had initially cited a handful of documents that they, in their own words, only came up because they surfaced, not because they searched for them, but because they surfaced in their language. That is sufficient to show that they had no intention of complying with the obligation to identify these documents. But when the judge says, this is one of the three reasons that I'm finding waiver and one of those is just wrong, that doesn't matter with regard to his finding of waiver? I think, Your Honor, the way in which that was mistaken doesn't matter and keep in mind, these are three independently sufficient bases for waiver. The most powerful, I think, is the one that I started with, which is four months of deliberate defiance. There's no way of walking around this. Four months of deliberate, I am not going to identify those documents and that was the word that the court used in its order. Well, over the course of that period of time, weren't there some agreements between the parties about extending deadlines and those kinds of things? Only an agreement as far as this requirement goes, only for two weeks. That's why, as I was quoting, we agreed to a modest modification. Not a modification entitling Media Matters to essentially push this back to the end of discovery. In fact, one of the emails in 1645 and 1646 specifically objects to Media Matters' attempt to, I believe the language in the email is, push this material to the end of the discovery stack. At no point would we have extended it to the end of the discovery period and more to the point, the district court had liquidated this issue to an order. It's come to an order now. The parties aren't free to just set the order aside and say, well, we decided something else. Media Matters knew about the order. The order was very specific. Identify, log, deliver. None of those three things occurred. And I think the district court's order is only incorrect to the extent that he made a comment about no log occurring. To the extent there was no log of these First Amendment privileges of these documents, that was correct. So to sort of go on that as a basis of waiver, that's sufficient for this court to not have to address the state action questions, which I think are clear because the U.S. Supreme Court, even Bonta itself is clear that state action is required, the First Amendment's exacting scrutiny, but this court doesn't need to enter those questions at all because this waiver basis is sound. I think the other concern I heard the court bring up was attending to the donor information and why that would be possible. I might want to revise, I want to sort of revisit my friend on the other side's last answer to your question, Judge Graves. All four of these RFPs aren't meaningfully in contention. The latter two, RFPs 21 and 35, they relegated to a footnote in their opening briefing. We pointed out in our response brief that they relegated that response. Then they relegated their reply to another footnote. As the motions panel said, there's not really a contest of whether or not RFPs 21 and 35 are relevant, not a serious one. Now to the extent that your concerns or my friend's concerns lay in harassment rather than relevance, I understand those. However, the district court acknowledged that harassment possibility as well and identified not merely the protective agreement, which binds the parties, but also stated that before X can use any of this information and he spelled out even to share it with the client, X has to seek explicit permission from the court in advance. Those are the court's words. Before that's given, media matters will have an opportunity to object and to raise any objections it might have. So even if this order is affirmed in full, we aren't free to take this information and use it even in the tiniest way without then seeking express district court approval. That kind of power combined with the rule 37 sanctions that we certainly don't want to be on the wrong side of, provide more than adequate protections against the harassment concerns that my friend on the other side . . . Mr. Stone, I thought I heard you say that as you read the district court's order, it did include an analysis of harassment. Is that true? Because I didn't really see it. I saw proportionality. I saw relevance. I didn't see a lot of treatment of harassment. Well, the district court addresses in 2168 and 2169, it goes specifically to talking about the protective order and its effects on this confidential information. I think the only way of interpreting that is that it is addressing harassment because that's the thing to which that was responsive. And I believe that in fact the actual protections included it to ROA 2169 and then highlighted again in the state order at 2305 highlight that again, we have to seek express permission. We would be subject to the district court's rule 37 or perhaps even contempt sanctions. That's powerful medicine to keep us from letting this information . . . Express permission to do what? You'd have to seek express permission to share it with whom? With even the client. It says that specifically in the court order that we have to seek permission even to share it with the client. The attorney's, the attorney protection order allows us, as I understand correctly, allows us to share with two pre-designated counsel that we've all agreed on in the protection order. Outside of that, no one at ExCorp can receive this information without our seeking advanced permission and during which Media Matters has an opportunity to object. We can't use it for any reason whatsoever and that's on the face of the district court's order. Once it's stated, once it's identified, isn't it sort of naive to say, oh, no one will find out about it in this day and age when everyone finds out about everything? I don't think that's naive, Your Honor, particularly because, again, these sorts of attorney to confidential information agreements are in high-dollar litigation in important cases all the time. This is a nine-figure case for Ex and Rule 37 would entitle the district court, in the case of a gross violation, to go so far as to striking our claims. So to the extent that this case matters, and it certainly matters to ExCorp, we'd be subject to death penalty sanctions for severe misbehavior, not to mention respectfully, potentially criminal or civil contempt sanctions if someone at ExCorp over the district court's direct instruction were to receive or misuse this information notwithstanding a court order. I wouldn't want to be in the Northern District of Texas in front of Judge O'Connor for having defied one of his orders. I can't imagine anyone at ExCorp wants to do either. Is a fine one of the sanctions that could be imposed under Rule 37? I'm so sorry, I can't . . . Is a fine one of the sanctions that could be imposed under Rule 37? It's not enumerated in the kinds of sanctions allowed. I think it probably would be in keeping with those sanctions, but at minimum, I would think it'd be within the court's inherent contempt power for deliberate disobedience. So I would think the district court would have the power to impose a fine for failure to keep this material secret. And I guess I ask that because this court determined that Media Matters had waived a constitutional right. That's a pretty, in my view, draconian sanction. So there was some sanction that could have been imposed short of a determination that a constitutional right had been waived. It seems like maybe the court should have considered that. Well, Your Honor, I think the . . . Any evidence that it considered some other sanction short of waiver of a constitutional right? These were all performed on the papers. There weren't any arguments, so there's nothing outside of the paper filings for that. But I will tell you, Your Honor, what's in the June 6th order is comparatively narrow. Media Matters is acting as though the district court's order waives their First Amendment privilege for all purposes and all places at all times. All they were required to do on June 6th, with the June 6th order, was marshal their documents that they wanted to claim privilege order over and then lock them. That's it. That's all Rule 26 required. That's all the district court required. Even still, this waiver, which, again, maintains well-founded multiple bases over, still only requires them to produce those documents, and now we, on a document-by-document basis, have to justify using them to the district court. We aren't free to share them publicly. We aren't free even to share them with our client publicly. So on the scale of potential sanctions, he hasn't even eliminated the possible use of, for example, the First Amendment sanction for evidentiary purposes at trial. This isn't . . . this is far from the most severe sanction under Rule 37 that a district court could have imposed for months of defiance. I guess there's only one more point that I want to get to that I don't think has come up so far, Your Honor, which is to say the jurisdictional point. My friend on the other side treats that as a result by Whole Woman's Health, and of course it wasn't. Whole Woman's Health dealt with third-party individuals from whom discovery had been sought under a Rule 45 order. This court, when it deals with collateral orders under the collateral order doctrine, does not dispense them out . . . does not dispense them out sort of engrossed to all First Amendment questions. Instead, the third-party qualification, that requirement came up in Leonard . . . in this court's case in Leonard in 2022, where the same author, Judge Jones, characterized that as third parties with . . . subject to discovery orders with First Amendment rights. So at minimum, Whole Woman's Health doesn't require this court to come to that conclusion. I would say on the other side . . . I mean, when you ask for the names, addresses, the information about the donors, they're not parties to the litigation, and so they're third parties, but you're disclosing all of their private confidential information. Respectfully, Your Honor. And . . . I'm sorry. That's the right we're talking about, isn't it? But the posture . . . Pre-association. The posture matters as well. If, for example, there were third parties before the district court who sought some sort of protective order based on their First Amendment privilege, that I think, under Whole Woman's Health, would be a permissible interlocutory collateral order. It's just that the distinction between third parties, who don't have a recourse eventually to final judgment and appeal, stand differently for interlocutory appeals than parties who do. It's a critical distinction this court recognized both in Whole Woman's Health itself and in Leonard, and I might say on top of that, Your Honor, this court has to come to a square circuit split with the Tenth and Sixth Circuits if it wants to conclude that a party to a litigation who is asserting a First Amendment associational right has an immediately appealable collateral order. There's no way around that. Both the Tenth and Sixth Circuits are held that squarely. That circuit split has not occurred yet. It was not provoked in Whole Woman's Health in the first place. This court would have to do so. I guess my last point on jurisdiction, Your Honor, goes back to Mohawk, which is to say the reason why this court and the U.S. Supreme Court sort of gradiates out some orders are interlocutorily appealed and some are not depends in part on some consequences to these third parties. So recall in Mohawk, it was an attorney-client privilege, and the U.S. Supreme Court said, well, we understand that, of course, this is to some extent, if you aren't able to interlocutorily appeal this, this will to some extent affect whether or not people seek the right of the privilege, but it's not going to affect people's decisions very frequently. People will probably still seek the attorney-client privilege because we don't think the people who seek attorney advice are thinking about whether or not an interlocutory appeal versus a final judgment appeal are available. I think if that's attenuated for U.S. Supreme Court purposes, the idea that Media Matters donors are considering when they choose to donate, whether Media Matters in a defamation lawsuit will have an interlocutory appeal or an appeal after final judgment, the idea that that was something in their mind, that seems just hard to believe. If there are no further questions, Your Honors, I'm happy to cede the balance of my time. Thank you, Counsel. Rebuttal. So I want to begin with the point, Judge Graves, you just made, that third-party rights are directly implicated. That's whose rights are primarily implicated, and if you look at the associational cases from the Supreme Court, NAACP in the Alabama case was the party, but the court was primarily concerned with its members. In Americans for Prosperity, Chief Justice Roberts is talking mainly about the donors' rights. And so you have third-party rights directly implicated here. That affects both jurisdiction but also the waiver analysis. I mean, as I've explained, there was no waiver even by Media Matters, but to say that the conduct in the district court where we continuously were pressing this First Amendment issue waived the rights of all these donors just makes no sense whatsoever. So I want to come back to the waiver. Ex's counsel said that our First Privilege Log did not include First Amendment objections. That's just wrong. It's in the record at 2037. We raised the First Amendment right of association on our Privilege Log for documents that were the strategic internal communications. We didn't raise it for any donor information because as I've explained, our objections on Rule 26 grounds were still valid. Judge O'Connor had refused on June 6th to rule on those, so they were pending valid objections. And so we were searching for terms like Ex and Musk, and if those terms had produced documents that revealed our donor information, we then would have logged that on the Privilege Log. But the search revealed no donor information when we searched for Ex, Musk, etc. So there were no such documents, donor documents, to put on that First Privilege Log. On this issue of compliance with the court order, he gave no explanation for what first means. He completely ignores that word in the district court's amended scheduling order. And it said the first log would be produced on June 28th, and that's exactly what we did. And then we continued to run Privilege Logs and filed one later in the summer. So going back to the question of the standard for waiver, every case says that when you waive a constitutional right, there has to be intentional conduct. He started off by saying this was sanctionable conduct. We strongly disagree. We complied with the exact words the district court put in its order. But even if there was some mistaken disobeying of a court order, to say that that constitutes an intentional waiver of First Amendment rights makes no sense whatsoever when, again, all this litigation, all the back and forth with counsel, all the briefing with the court was focused on the First Amendment. So when you conduct the independent examination of the record that you have to do because a First Amendment issue is at stake, there is no basis for finding waiver. And I think that's important to emphasize. There are two separate standard of reviews here. First is the waiver standard in and of itself in the district court, intentional waiver. But then there's the appellate standard, and the normal deference to the district court does not apply when you're talking about a First Amendment issue. The Supreme Court explained that in Bowes, and it's been followed by this court in other cases. I now want to respond to his arguments that, well, there's protection, this information would just be disclosed to outside counsel. First of all, he ignores what the motions panel said about that. The judge refused to enter the protective order. There is a protective order between the parties like any other contract out there. But because Judge O'Connor refused to enter it and give it the imprimatur of the court, there is no legal compulsion behind it. So he's saying, oh, we can be held in contempt. No, as the motions panel recognized that. There is no court-entered order that they would be violating. There's no legal compulsion behind it. So we would have to, you know, go file a civil case for breach of contract, which does not give much comfort to my client or to its donors. Some other points about the protective order. The Perry case, which again, where the First Amendment privilege was applied by the Ninth Circuit to a group that was supporting California's same-sex marriage, it says protective orders don't solve this privilege problem. Right? If it did, how would Whole Woman's Health have come out the way it did? How would Perry have come out the way it did? Because as counsel on the other side recognizes, these protective orders are standard. But there's still a concern with chilling the associational rights. We don't have to show that it would actually be conveyed to acts and actually used to inflict harm on our donors. The issue is chilling. And absolutely, think of how . . . think of Media Matters, its attempts now to solicit donors if it turns out that this information is turned over to exes outside lawyers. That's going to have an immediate chilling effect. People aren't going to want to donate if they think that their names and addresses and how much they gave are going to be turned over in litigation. So for those reasons, we would ask to follow, you know, the concerns that the state panel recognized and reverse the district court's order. Thank you. All right. Thank you, counsel. The court will take this matter under advisement. This concludes the matters on today's docket. We are adjourned.